IN RE: PARKER, MINOR CHILDREN

No. 8730DC1122

(Filed 7 June 1988)

1. **Parent and Child § 1.6— termination of parental rights—finding sufficient**

In an action to terminate parental rights, detailed findings of fact entered by the trial judge depicted circumstances and events existing prior to removal of the children from the home by DSS as well as those occurring while the children were in foster care, and the evidence of neglect existing prior to removal of the children from the home and the conduct of the mother while the children were in foster care supports the conclusion of the trial court that at the time of the termination proceeding, the children were neglected pursuant to N.C.G.S. § 7A-289.32(2).

2. **Parent and Child § 1.5— termination of parental rights—dispositional stage—no abuse of discretion**

The trial court did not abuse its discretion in the dispositional stage of a termination of parental rights proceeding by terminating parental rights where the court entered findings that two experts were of the opinion that the children would be harmed if they were returned to the mother, the guardian ad litem was of the opinion that it would be in the best interest of the children to terminate parental rights, and the children had been in foster care for three years and were seven and nine years of age.

3. **Evidence § 29.3— termination of parental rights—hospital records of mother—excluded—no error**

The trial court did not err in a termination of parental rights proceeding by excluding the mother's hospital records because of a lack of adequate foundation where the mother did not attempt to follow proper procedure for introducing the records at the hearing, there was no evidence that she attempted to authenticate the documents through any of the procedures set out in N.C.G.S. § 8-44.1, and the record on appeal does not show the substance of the excluded evidence and prejudice could not be determined. N.C.G.S. § 8C-1, Rule 103(a)(2).

4. **Parent and Child § 1.6; Appeal and Error § 48.4— termination of parental rights—statements of children—excluded—prejudice not shown**

The mother in a termination of parental rights proceeding failed in her burden to show that alleged error was prejudicial where the court sustained objections to the introduction of statements of the children made to the mother outside of court. N.C.G.S. § 8C-1, Rule 803(3).

APPEAL by respondent-mother from *Davis (Danny E.), Judge.* Judgment entered 2 July 1987 in District Court, CHEROKEE County. Heard in the Court of Appeals 6 April 1988.

*Merinda Swanson Woody for petitioner-appellee.*

*McPeters & Davis, by M. Ellen Davis, for respondent-appellant.*

*Deborah L. Nichols, P.A., as Guardian ad Litem.*

GREENE, Judge.

This proceeding arises from the Cherokee County Department of Social Services' petition to terminate the parental rights of the parents of two minor children. The trial court granted the petition and the mother appeals from the portion of the order terminating her rights.

The Department of Social Services (hereinafter "DSS") filed the petition in May 1986 alleging as grounds for terminating the mother's parental rights, N.C.G.S. Secs. 7A-289.32(2) (neglect or abuse), 7A-289.32(3) (children willfully left in foster care for 18 months) and 7A-289.32(4) (1986) (parents' willful failure to pay reasonable portion of care cost of children in foster care). The trial court concluded grounds existed for termination under all three subdivisions. Since we hold the trial court's findings of fact support its conclusion of law that the mother's parental rights could be terminated under N.C.G.S. Sec. 289.32(2), it is unnecessary to determine if termination was proper pursuant to the other subdivisions. *See* N.C.G.S. Sec. 7A-289.31(a) (1986) (a court may issue order terminating parental rights if court determines any one of the conditions authorizing termination exists).

---

The issues presented are: I) whether the findings of fact support termination of the mother's parental rights on the grounds the children were neglected pursuant to N.C.G.S. Sec. 7A-289.32(2), II) whether the trial court abused its discretion in determining that it was in the best interests of the children to terminate the mother's parental rights, and III) whether the trial court erred in excluding from evidence certain hospital records of the mother and statements made by the children to the mother.

I

[1]  To support termination of parental rights under N.C.G.S. Sec. 7A-289.32(2), there must be clear, cogent and convincing evidence that neglect exists at the time of the termination proceeding. *In re Ballard,* 311 N.C. 708, 716, 319 S.E. 2d 227, 232 (1984). Where there has been a prior adjudication of neglect as here, "evidence of neglect by a parent prior to losing custody of a child —including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights. The trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *Id.* at 715, 319 S.E. 2d at 232. The trial court is required to consider all relevant evidence of "circumstances or events which existed or occurred *either before or after* the prior adjudication of neglect." *Id.* at 716, 319 S.E. 2d at 232-33 (emphasis in original). However, while the court may admit into evidence and consider any previous adjudications of neglect, a prior adjudication of neglect is not dispositive on the issue of neglect under N.C.G.S. Sec. 7A-289.32(2). *Id.* at 715, 319 S.E. 2d at 232.

The mother has not preserved any exceptions or assignments of error to the essential findings of fact entered by the trial court because she fails to bring them forward and argue them in her brief. *See Baker v. Log Systems, Inc.,* 75 N.C. App. 347, 350-51, 330 S.E. 2d 632, 635 (1985) (where appellant does not bring forth exceptions in his brief to certain findings of the trial court, he is deemed to have abandoned them under N.C.R. App. P. 28(b)(5) ). Therefore, we only determine if the findings made by the trial judge support the conclusions of law.

In its findings of fact, the trial court incorporated by reference the 3 April 1984 order adjudicating the children to be neglected and abused, the three subsequent orders of review, and three service agreements entered into between the mother and DSS.

In the 3 April 1984 order, the trial court found the mother's boyfriend had abused the children and the mother had not provided the children with adequate nutrition and a proper living environment. The court also found the children were "continuously filthy" and had been treated at the local hospital on five different occasions for ingestion of foreign materials. The trial court con-

cluded the children had been abused and neglected and placed physical and legal custody of them with DSS.

The 12 September 1984 review order found the mother had visited with her children only once in six months and had failed to establish a residence. The trial court ordered regular visits between the mother and her children to occur twice a month. The 6 March 1985 review order found the mother had visited with her children on three occasions since 12 September 1984 and had not yet established a residence. On 6 March 1985, the mother was ordered to terminate her association with her boyfriend and to keep DSS informed of her current address. The 23 August 1985 review order found the mother continued to associate with her boyfriend, ordered custody to continue with DSS, and ordered the mother to begin child support payments in the amount of $10 per week.

The service agreements entered into by DSS and the mother required, among other things, that DSS provide foster care for the children and make the children available for visits with the mother. DSS agreed to arrange transportation for the mother to go to and from the mental health center. The mother agreed to visit with her children twice a month, to participate in mental health counseling sessions, to attend parenting classes, to keep DSS advised of her current residence, to do volunteer work in a child care unit, and to terminate her relationship with her boyfriend, Claude Hartness. The 11 October 1984 agreement specifically provided that the mother's failure to abide by the agreement could result in a petition for termination of parental rights.

On the issue of neglect in the present case, the trial court entered the following relevant findings:

20. The conditions leading to the removal of the children from the home in that order of adjudication and disposition entered April 3, 1984 and signed April 20, 1984 were:

(a) That the conduct of said Claude Hartness toward the child, Jennifer, was abusive, in that he kissed the child on the mouth, pressing his teeth against hers, and forcing his tongue into her mouth.

(b) That Jennifer has been subjected to other physical abuse, as in December, 1983, said child was seen to have

welts on her back, beginning at her shoulder blades, and extending to the backs of her knees, and the Court finds that the cause of those welts has not been satisfactorily explained by the mother.

(c) That as early as January, 1983, the child, Jason, then age 4 years, 2 months, had to be treated for an abscessed tooth. The Court finds that such a condition is unusual in such a young child, and is the result of the neglect of the mother, in that she failed to provide proper dental care, proper nutrition, and proper supervision to make sure Jason brushed his teeth on a regular basis and in a correct manner. The Court further finds that the mother, as a recipient of AFDC, also received Medicaid, which program would have paid for all necessary dental care without charge to the mother.

(d) That the mother has engaged in a pattern of neglect, as a result of which the children have had to be treated at the emergency room of Murphy Medical Center, for the ingestion of foreign objects, on the following dates:

1. January 4, 1981 — Jason reported to have swallowed a glass thermometer. X-Rays failed to show anything;

2. April 23, 1981 — Jason swallowed Prestone antirust fluid for radiators. No treatment was necessary as the substance was a mineral oil compound;

3. October 17, 1981 — Jason swallowed overdose of Dimetapp, an antihistamine, and Ampicillin, an antibiotic. He was treated with Syrup of Ipecac, which induced vomiting;

4. October 3, 1981 — Jennifer, in the course of emergency treatment for a purported fall, reported to have swallowed glass earlier in the day;

5. November 4, 1982 — Jennifer ate soap. She was given a lot of fluids.

The Court finds the pattern of neglect to be particularly hazardous to the children due to the possibility they might ingest a more dangerous substance that could prove fatal.

(e) That the children have been living in an environment which is dangerous and injurious to their health and welfare,

in that the mother has failed to provide a stable home for the children, living in at least four different locations in Cherokee County within the last eighteen months. The Court finds further that the mother has not made a real effort to establish a home for the children, and that she has been more interested in her own personal gratification of being with Claude Hartness, than in the welfare of her children.

. . . .

23. Of 59 visits which were scheduled for Merris Parker to visit with her children, she missed 25 visits . . . .

24. The social worker testified Jennifer was emotionally upset when her mother would cancel visits; . . . an expert witness in the field of psychology . . . testified that when visits with the mother were canceled by the mother, Jason became abusive toward others.

25. Merris Parker . . . had four different admissions to Smoky Mountain Mental Health, three of the four having to be terminated because of her non-attendance; she is currently continuing to be seen in her last admission of March 16, 1987.

26. Merris Parker did not attend any parenting skills classes through Developmental Evaluation Center for failure to take the Minnesota Multiphasic Personality Inventory test; she did attend 6 out of 22 parenting skills classes offered to her from the Cherokee County Home Extension Office.

. . . .

31. Merris Parker did find adequate housing in March 1986 but lived there for 4 months and then left the area and did not return to the area until October, 1986; that she presently resides in a two bedroom house in Cherokee County, North Carolina with her husband, Claude Hartness.

32. In the Order dated April 3, 1984, the Court found Merris Parker moved four times in 18 months prior to that hearing; and this Court finds that since the hearing on April 3, 1984, Merris Parker has moved seven times.

33. For a total period of fourteen months Cherokee County Department of Social Services did not know the whereabouts of Merris Parker . . . .

34. Merris Parker did not send Christmas presents to the children in December, 1984.

. . . .

36. The juvenile order entered in March 5, 1985 ordered Merris Parker not to associate with Claude Hartness.

. . . .

42. Jennifer expressed fear toward Claude Hartness.

. . . .

45. Turner Guidry's expert opinion was that it would cause Jennifer harm if she were returned to her mother
. . . .

46. Judge Snow, in the order entered on April 3, 1984, made a finding in that order that Claude Hartness had sexually abused Jennifer; and the Court now finds that Claude Hartness married Merris Parker on June 5, 1986 while Claude Hartness was in prison, and that they now live together as husband and wife.

47. Merris Parker did attend Smoky Mountain Mental Health sporadically and did not attend often enough for the counselor, Mary Ricketson to form an opinion as to whether Merris had made any progress.

. . . .

52. Carl Deischer testified that in his expert opinion it would be harmful for Jason to be returned to his mother
. . . .

On the issue of neglect, the trial court entered the following pertinent conclusions of law:

5. Merris Parker has neglected the children in that she left three different periods of time for a total of 14 months during the past three years the children have been in foster

care, thus withholding her companionship, her society and her parental affection from the children.

. . . .

10. Merris Parker does not have a suitable home for the children in that they would be living in an environment injurious to their welfare in that Claude Hartness lives there.

The detailed findings of fact entered by the trial judge depict the circumstances and events existing prior to the removal of the children from the home by DSS as well as those occurring while the children were in foster care. Prior to their removal: the mother and children had lived with the mother's boyfriend who had abused the children, over a period of several months the children were treated in the local hospital emergency room for five different incidents of ingestion of foreign materials including glass, antihistamines, and antirust fluid, and the mother and children had lived in four different locations over an eighteen-month period. While in foster care the mother: missed 25 out of 59 scheduled visits, attended only 6 out of 22 scheduled parenting classes, was terminated from mental health counseling because of nonattendance, moved her residence seven times, failed to advise DSS of her whereabouts for a period of 14 months, and married the boyfriend who had been found to have abused her children.

The evidence of neglect existing prior to removal of the children from the home and the conduct of the mother while the children were in foster care supports the conclusion of the trial court that at the time of the termination proceeding, the children were neglected pursuant to 7A-289.32(2). *See In re Montgomery*, 311 N.C. 101, 109, 316 S.E. 2d 246, 252 (1984) (a child may be found to be neglected if parent does not correct within a reasonable time the conditions giving rise to neglect).

## II

[2] Once a petitioner meets its burden of proof at the adjudicatory stage, the court's decision to terminate the parental rights is discretionary. *Montgomery*, 311 N.C. at 110, 316 S.E. 2d at 252. There is no requirement that the adjudicatory and dispositional stages be conducted at two separate hearings. *In re White*, 81 N.C. App. 82, 85, 344 S.E. 2d 36, 38, *disc. rev. denied*, 318 N.C. 283, 347 S.E. 2d 470 (1986).

At the dispositional stage a court is required to issue an order of termination unless it "determine[s] that the best interests of the child require that the parental rights of such parent not be terminated." N.C.G.S. Sec. 7A-289.31(a). In determining the best interests of the child, the trial court should consider the parents' right to maintain their family unit, but if the interest of the parent conflicts with the welfare of the child, the latter should prevail. *See Montgomery,* 311 N.C. at 116, 316 S.E. 2d at 256.

The trial court entered findings that two experts were of the opinion the children would be harmed if they were returned to the mother. Additionally, the court found the guardian ad litem for the children was of the opinion it would be in the best interests of the children to terminate the parental rights. The children had been in foster care over three years and at the time of the hearing were seven and nine years of age. We therefore find no abuse of discretion in the trial court's decision that it was in the best interests of the children to terminate the parental rights of the mother.

III

[3] The mother finally argues the trial judge erred in excluding certain evidence tendered by the mother during the course of the termination proceeding. The trial court sustained objections to the mother's efforts to introduce her hospital records because of a lack of an adequate foundation. A hospital record is a business record, and is admissible into evidence upon the laying of a proper foundation. A proper foundation consists of testimony from a hospital librarian or custodian of the records or other qualified witnesses to the identity and authenticity of the record and the mode of its preparation. In addition, it must be shown that the entries were made at or near the time of the event, made by persons having knowledge of the data set forth, and made "*ante litem motam.*" *Donavant v. Hudspeth,* 318 N.C. 1, 6, 347 S.E. 2d 797, 801 (1986). The mother did not attempt to follow this procedure at the hearing nor is there any evidence that she attempted to authenticate the document through any of the procedures set out in N.C.G.S. Sec. 8-44.1 (1986) which provides methods for the authentication of medical records. In any event, even had the exclusion been error, the record does not show the substance of

the excluded evidence and we are unable to determine if the ruling of the court was prejudicial. N.C.G.S. Sec. 8C-1, Rule 103(a)(2) (error may not be predicated on exclusion of evidence unless the "substance of the evidence was made known to the court" by an offer of proof or was apparent from the context of the questions asked). *See also State v. Satterfield,* 300 N.C. 621, 628, 268 S.E. 2d 510, 515-16 (1980).

[4] The trial court also sustained objections to the mother's efforts to introduce statements of her children made to her outside the court. The mother argues this evidence is admissible under the exception to the hearsay rule, N.C.G.S. Sec. 8C-1, Rule 803(3), as reflecting the then existing mental and emotional state of the children. However, as the mother has failed in her burden to show that the alleged error was prejudicial, we do not determine whether the court erred in excluding the evidence. *Cook v. Southern Bonded, Inc.,* 82 N.C. App. 277, 346 S.E. 2d 168 (1986) (to prevail on appeal, appellant must show not only error, but that error was material and prejudicial, amounting to denial of substantial right and likely affecting result), *disc. rev. denied,* 318 N.C. 692, 351 S.E. 2d 741 (1987).

The judgment of the trial court terminating the parental rights of the mother is therefore

Affirmed.

Judges BECTON and JOHNSON concur.